IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| PERSHING LLC, | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | 1:20-CV-587-RP |
| | § | |
| FULCRUM CAPITAL HOLDINGS LLC | § | |
| and FULCRUM CREDIT PARTNERS LLC, | § | |
| | § | |
| Defendants. | § | |

**ORDER**

Before the Court are Plaintiff Pershing LLC's ("Pershing") motion for a preliminary injunction, (Dkt. 5), Defendant Fulcrum Capital Holdings LLC and Fulcrum Credit Partners LLC's (together, "Fulcrum")[1] response in opposition, (Dkt. 9), and Pershing's reply, (Dkt. 11); as well as Fulcrum's motion to dismiss for improper venue, (Dkt. 10), and Pershing's response in opposition, (Dkt. 12). The Court held a telephonic hearing on Pershing's motion for a preliminary injunction on June 29, 2020. (*See* Order, Dkt. 7). After considering the parties' arguments, the record, and the relevant law, the Court grants Pershing's motion and imposes a preliminary injunction prohibiting Fulcrum from arbitrating its claims against Fulcrum in the FINRA arbitrations. The Court denies Fulcrum's motion to dismiss.

**I. BACKGROUND**

Pershing is a clearing broker that provides clearing and administrative services to other broker-dealers. (Compl., Dkt. 1, at 2). Unlike other broker-dealers, clearing firms like Pershing do

---

[1] Pershing notes in its motion that Fulcrum Capital Holdings LLC and Fulcrum Credit Partners LLC "are identically situated" for the purposes of assessing its entitlement to injunctive relief. (Mot. Prelim. Inj., Dkt. 5, at 2). Accordingly, the Court will refer to them collectively as "Fulcrum."

not typically have investor clients of their own. (*Id.* at 3). Instead, clearing firms perform administrative "back-office" services for other broker-dealers who do have investor clients. (*Id.*).

Clearing firms, like other broker-dealers, are required to be members of the Financial Industry Regulatory Authority ("FINRA"). (*Id.*). FINRA "offers a forum for arbitration of various claims in and against members of the securities industry." *Janney Montgomery Scott LLC v. Greenberg*, 2010 WL 2835562, at *1 (S.D.N.Y. July 1, 2010). Because of Pershing's FINRA membership, its customers have the right to compel Pershing to arbitrate their disputes under FINRA Rule 12200. (Mot. Prelim. Inj., Dkt. 5, at 14).

### A. Pershing's Clearing Agreement with Stanford Group Company

In 2005, Pershing entered into a clearing agreement with Stanford Group Company ("SGC"), an introducing firm owned by Allen Stanford. (*Id.*). According to Pershing, the clearing agreement "allocated all client-facing responsibilities, including the provision of investment advice, to SGC." (*Id.*). After Pershing and SGC signed the clearing agreement, Pershing entered into Client and Margin Agreements with some SGC customers. (*Id.*). These Client and Margin Agreements contained the following arbitration provision:

> Any controversy between you and Stanford Group Company or Pershing shall be submitted to arbitration before the Financial Industry Regulatory Authority (FINRA).

(*Id.*).

### B. The Stanford Ponzi Scheme and Efforts to Recover Assets

Allen Stanford owned an offshore bank based in Antigua called Stanford International Bank Limited ("SIBL"), which sold Certificates of Deposit ("CDs") at interest rates much higher than CDs offered by FDIC-insured banks in the United States. (Mot. Prelim. Inj., Dkt. 5, at 4). Investors expected that SIBL would use the money it received to buy lucrative assets, but instead, "Stanford and his associates used the money provided by new investors to repay old investors, to finance an

elaborate lifestyle, and to finance speculative real estate ventures." *Pershing, L.L.C. v. Bevis*, 606 F. App'x 754, 755 (5th Cir. 2015) (per curiam). Financial advisors employed by SGC advised many of their customers—some of whom were also Pershing customers—to purchase CDs from SIBL. (Compl., Dkt. 1, at 5). While Pershing had a clearing agreement with SGC, it insists it "never had any clearing agreement or other relationship with SIBL." (*Id.*).

In 2009, the SEC exposed that Allen Stanford was operating a Ponzi scheme and that the SIBL CDs were fraudulent. (Mot. Prelim. Inj., Dkt. 5, at 5). The SEC succeeded in shutting down SIBL and SGC. (*Id.*). Stanford and his co-conspirators are now serving prison terms for multiple financial crimes. (*Id.*). In an effort to make defrauded investors whole, appointed receivers have collected remaining Stanford assets and made cash distributions to defrauded investors with approved claims. (*Id.* at 6). Knowing that these distributions "will fall far short of investors' losses and will not be complete for years to come," some defrauded investors have tried to recoup their losses in other ways. (*Id.*). For example, some investors have pursued aiding and abetting claims against Pershing,[2] while others have sought to monetize their approved receivership claims by selling them to hedge funds at a discount. (*Id.*).

### C. Fulcrum's Purchase, Sale, and Assignment Agreement with SIBL Investors

Fulcrum Capital, a "boutique investment firm specializing in the trading and analysis of distressed and special situation investment opportunities," entered into Purchase, Sale and Assignment Agreements ("PSAs") with investors who had purchased SIBL CDs, some of whom were Pershing's former clients. (Compl., Dkt. 1, at 6). The PSAs "sold, assigned and transferred a broad category of rights and property" to Fulcrum, defined as "Transferred Rights." (Resp., Dkt. 9, at 4). Pershing contends these PSAs "are focused on the transfer of approved receivership claims

---

[2] Pershing maintains these claims are unfounded because it had a "limited role as a clearing firm for SGC" and had "no material involvement with SIBL CDs." (Compl., Dkt. 1, at 5).

3

and the ability of Fulcrum, post-assignment, to receive distributions from the receivers." (Reply, Dkt. 11, at 3). Fulcrum, on the other hand, argues the SIBL investors "sold all of their 'Transferred Rights,' which is defined broadly enough to cover both an assignment of the [Client and Margin Agreements] and the sale of their rights against Pershing." (Resp., Dkt. 9, at 4).

### D. The Current Dispute

In February 2020, defrauded SIBL investors—all signatories to Client and Margin Agreements with Pershing—brought four FINRA arbitration claims against Pershing. (Mot. Prelim. Inj., Dkt. 5, at 9). Because Pershing directly contracted with these investors, Pershing did not challenge their right to arbitrate under the Client and Margin Agreement's arbitration provision. (*Id.*). In May, the SIBL investors amended their pleadings, adding Fulcrum as a claimant. (Farrell Decl., Dkt. 5-1, at 2). Fulcrum then filed three additional FINRA arbitrations against Pershing, bringing the total to seven. (*See id.*). Fulcrum contends it has standing to arbitrate its claims against Pershing because it purchased these claims from defrauded SIBL investors who had Client and Margin Agreements with Pershing. (Mot. Prelim. Inj., Dkt. 5, at 10). These Client and Margin Agreements contained a mandatory arbitration provision. (*Id.* at 8).

Pershing contends that Fulcrum has no right to assert its claims against Pershing in a FINRA arbitration because the two parties never entered into a written agreement requiring arbitration and Fulcrum has never been Pershing's "customer." (*Id.* at 11). Accordingly, Pershing asks the Court to declare that it has no obligation to arbitrate Fulcrum's claims and to enjoin the seven arbitrations currently in progress. (*Id.* at 20).

Fulcrum opposes Pershing's motion and contends it has the right to compel arbitration as the assignee of the Client and Margin Agreements. (Resp., Dkt. 9, at 4). Specifically, Fulcrum contends the SIBL investors "conveyed their rights to bring CD-related claims to Fulcrum" through

4

a Purchase, Sale and Assignment Agreement, which "allows Fulcrum to stand in the shoes of the investor and bring claims relating to the CD."[3] (Mot. Dismiss, Dkt. 10, at 4).

## II. LEGAL STANDARD

To obtain a temporary restraining order or preliminary injunction, the moving party must demonstrate "substantial likelihood of success on the merits, substantial threat of irreparable harm absent an injunction, a balance of hardships in [its] favor, and no disservice to the public interest." *Daniels Health Scis., L.L.C. v. Vascular Health Scis., L.L.C.*, 710 F.3d 579, 582 (5th Cir. 2013). This is a "heavy burden." *Hardin v. Houston Chronicle Pub. Co.*, 572 F.2d 1106, 1107 (5th Cir. 1978).

Even so, the moving party "is not required to prove its case in full at a preliminary injunction hearing." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981). Instead, the moving party "must present a prima facie case, but need not prove that [it] is entitled to summary judgment." *Daniels Health Scis.*, 710 F.3d at 582. That is, "finding a 'substantial likelihood that movant will ultimately prevail on the merits' does not contemplate a finding of fixed quantitative value." *Fla. Med. Ass'n, Inc. v. U. S. Dep't of Health, Ed. & Welfare*, 601 F.2d 199, 203 n.2 (5th Cir. 1979). But if the moving party "*cannot* show a substantial likelihood of success on the merits, the injunction should be denied and there is no need for the court to address the other requirements for a preliminary injunction." *Butts v. Aultman*, 953 F.3d 353, 361 (5th Cir. 2020).

If the moving party surmounts that obstacle, it must then "show that it is 'likely to suffer irreparable harm,' that is, harm for which there is no adequate remedy at law." *Daniels Health Scis.*, 710 F.3d at 582 (quoting *Winter v. Natural Res. Def. Council, Inc.,* 555 U.S. 7, 20 (2008)). It must persuade the Court that "the competing claims of injury" and "the effect on each party of the granting or withholding of the requested relief" weigh in its favor. *Winter*, 555 U.S. at 24 (quoting *Amoco Prod. Co. v. Vill. of Gambell, AK*, 480 U.S. 531, 542 (1987)). And it must demonstrate that the

---

[3] Fulcrum also relies on an estoppel theory. *See infra* Part III.A.3.

"public consequences in employing the extraordinary remedy of injunction," to which "courts of equity should pay particular regard," militate in favor of injunctive relief. *Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).

### III.  ANALYSIS

#### A.  Likelihood of Success

Pershing contends it has shown a substantial likelihood of success on the merits because Fulcrum has "no basis on which to compel Pershing to arbitration." (Mot. Prelim. Inj., Dkt. 5, at 13). According to Pershing, there are only two bases for pursing claims against it in FINRA arbitration: the arbitration provision in the Client and Margin Agreements and the FINRA rules themselves. (*Id.* at 8–9). Specifically, Pershing notes that investors who signed Client and Margin Agreements with Pershing may compel arbitration by invoking the Client and Margin Agreement's arbitration provision. (*Id.* at 8). And because FINRA Rule 12200 requires a broker-dealer like Pershing to arbitrate any claims brought by its customers, investors who signed Client and Margin Agreements with Pershing may rely on their "customer" status as a secondary basis to compel arbitration. (*Id.* at 9). Because Fulcrum has no contract with Pershing requiring arbitration and has never been Pershing's customer,[4] Pershing argues that Fulcrum has no right to arbitrate its claims in a FINRA arbitration. (*Id.* at 11).

Meanwhile, Fulcrum argues it has the right to compel arbitration as the assignee of the Client and Margin Agreements. (Resp., Dkt. 9, at 4). In particular, Fulcrum contends that former Pershing clients who purchased SIBL CDs "sold, assigned, and transferred a broad category of rights," to Fulcrum, which included both an assignment of the Client and Margin Agreements these investors had with Pershing and the sale of their rights against Pershing more broadly. (*Id.*). As the assignee of

---

[4] In reviewing its own records, Pershing verified that it has never provided clearing or other brokerage services to Fulcrum and that the two parties have never executed a Client and Margin Agreement. (Newcome Decl., Dkt. 6, at 3–4).

6

the Client and Margin Agreements, Fulcrum says it "stands in the shoes of its assignor and has the same rights and interests as the Pershing clients," including the right to compel arbitration under the arbitration clause contained within these agreements. (*Id.*).

At the outset, the Court notes that the scope of its inquiry is narrow. Fulcrum neither contends it was a signatory to a written arbitration agreement with Pershing nor that it was ever a Pershing customer as contemplated by FINRA Rule 12200. (*See id.* at 3–7). Instead, Fulcrum hinges its right to arbitrate on the arbitration clause in the underlying investors' Client and Margin Agreements with Pershing. (*See id.* at 3). Because those Client and Margin Agreements contain a clause mandating the arbitration of any dispute between Pershing and those underlying investors, Fulcrum, as the alleged assignee of those agreements, contends it also has the right to arbitrate its claims against Pershing. (*Id.*). So, the narrow question the Court must answer is whether the PSAs assigned the Client and Margin Agreements to Fulcrum.

In support of its position, Fulcrum points to the broad language of the PSAs, which assign "all claims and causes of action that relate to, arise as a result of, or derive from certificate of deposit accounts with the Debtors [Stanford entities], including, without limitation, claims and causes of action in the U.S. Proceedings, the Antiguan Proceedings or any other proceeding or controversy." (PSA, Dkt. 5-2, at 176). Fulcrum contends this language made it the assignee of any of the underlying investors' claims touching upon the SIBL CDs, including claims against Pershing for its alleged involvement in the Stanford Ponzi scheme. (Resp., Dkt. 9, at 2, 4).

Pershing acknowledges that "Fulcrum may well have been assigned the legal right to file a lawsuit based on the underlying investors' SIBL CD purchases," but argues the PSAs' broad assignment of claims and causes of action "is separate and distinct from assigning the actual Client and Margin Agreements themselves." (Reply, Dkt. 11, at 2). According to Pershing, the PSAs "do

7

not even mention the Client and Margin Agreements," and even if they did, the Client and Margin Agreements are not assignable without Pershing's consent as a matter of law. (*Id.*).

The Court concludes that Pershing has sufficiently demonstrated a likelihood of success on the merits for purposes of the preliminary injunction analysis. *See generally* 11A Charles A. Wright, et al., *Federal Practice and Procedure* § 2948.3 (3d ed. Aug. 2019 update) ("The very purpose of an injunction under Rule 65(a) is to give temporary relief based on a *preliminary estimate* of the strength of plaintiff's suit, prior to the resolution at trial of the factual disputes and difficulties presented by the case.") (emphasis added). While the PSAs at issue appear to assign the underlying investors' CD-related causes of action, they do not assign the Client and Margin Agreements that contain the arbitration agreement. Even if they purported to do so, Pershing has sufficiently demonstrated that the Client and Margin Agreements are not assignable without its consent.

### 1. The PSAs Do Not Assign the Client and Margin Agreements

New York law governs the Client and Margin Agreements and the PSAs. (*See* Client and Margin Agreement, Dkt. 9-1, at 183; PSA, Dkt. 5-2, at 190). Under New York law, "no special form or language is necessary to effect an assignment as long as the language shows the intention of the owner of a right to transfer it." *St. Barnabas Hosp. v. Amisys, LLC*, No. 04 CIV. 2778, 2007 WL 747805, at *3 (S.D.N.Y. Mar. 9, 2007) (citing *Suraleb, Inc. v. Int'l Trade Club, Inc.*, 788 N.Y.S.2d 403, 404 (App. Div. 2004)). More specifically, although no particular phraseology is required to create an assignment under New York law, "there is a need for some 'act or words' that manifest an intent to assign." *Prop. Asset Mgmt., Inc. v. Chicago Title Ins. Co.*, 173 F.3d 84, 87 (2d Cir. 1999) (quoting *Miller v. Wells Fargo Bank Int'l Corp.*, 540 F.2d 548, 557 (2d Cir. 1976)); *see also Miller*, 540 F.2d at 557 (quoting *Advance Trading Corp. v. Nydegger & Co.*, 127 N.Y.S.2d 800, 801 (Sup. Ct. 1953)) ("[A]n assignment need not utilize any particular phraseology or form; any act or words are sufficient which 'show an

8

intention of transferring the [chosen] action to the assignee, when the assignor is divested of all control and right to cause of action and the assignee is entitled to control it and receive its fruits.'").

After examining the PSAs, the Court concludes they do not contain language manifesting an intent to assign the Client and Margin Agreements to Fulcrum. *See Prop. Asset Mgmt.*, 173 F.3d at 87(invalidating an alleged assignment based on "unmemorialized intentions"). While the PSAs indisputably assign a broad array of "Transferred Rights," the PSAs lack language indicating the parties intended to bundle the Client and Margin Agreements into that definition. (*See* PSA, Dkt. 5-2, at 178). As Pershing notes, the definition of "Transferred Rights" is "inextricably tied to the definition of 'Claims,' which is in turn inextricably tied to the definition of 'Deposit Account' and 'Deposit Claims.'" (Reply, Dkt. 11, at 4). Reading these definitions together, the chosen language suggests the parties to the PSAs intended to assign Fulcrum all claims and causes of action related to the assignors' SIBL CD purchases. (*See* PSA, Dkt. 5-2, at 175–79). But assigning a cause of action is not the same as assigning an underlying contract. *Cf. Nearpark Realty Corp. v. City Investing Co.*, 112 N.Y.S.2d 816, 817 (Sup. Ct. 1952) (distinguishing between the assignment of a contract and the assignment of a cause of action and noting that "in the absence of an assignment of a cause of action based upon the fraud, as distinguished from an assignment of the contract for the purchase of the property, the cause of action belongs to the assignor"). Absent language manifesting an intent to bundle the Client and Management Agreements within the definition of "Transferred Rights," the Court concludes the PSAs do not suggest the underlying SIBL investors intended to assign their Client and Margin Agreements to Fulcrum.

### 2. The Client and Margin Agreements Are Not Assignable

Even if the PSAs had purported to assign Fulcrum the Client and Margin Agreements, that assignment would likely be unlawful without Pershing's consent. Under New York law, contracts "involv[ing] a relationship of personal credit and confidence"—like the Client and Margin

9

Agreements—cannot be freely assigned. *Paige v. Faure*, 127 N.E. 898, 899 (N.Y. 1920) ("The general rule is that rights arising of a contract cannot be transferred if they are coupled with liabilities or if they involve a relationship of personal credit and confidence."); *see also Bentley v. Textile Banking Co.*, 271 N.Y.S.2d 417, 420 (App. Div. 1966). Fulcrum nevertheless contends that because Pershing has "offered no evidence that any client at issue actually had a margin account," the Client and Margin Agreements do not fall within the "credit contract" exception to the general rule that contracts are freely assignable.[5] (Resp., Dkt. 9, at 7). But whether the underlying investors actually took advantage of margin lending is irrelevant. The Client and Margin Agreements "involve the potential extension of credit by Pershing to end investors," and therefore "involve a relationship of personal credit and confidence," preventing their unilateral assignment under New York law. (Reply, Dkt. 11, at 7); *Paige*, 127 N.E. at 118.

Still, Fulcrum points to language in the Client and Margin Agreements that it contends "contemplate[s] assignment":

> This agreement shall cover individually and collectively all accounts that the undersigned may open or reopen with Pershing, and shall inure to the benefits of its successors or assigns, whether Pershing's merger, consolidation, or otherwise, and Pershing may transfer the accounts of the undersigned to its successors and assigns, and this agreement shall be binding upon the heirs, executors, administrators, successors and assigns of the undersigned.

(Client and Margin Agreement, Dkt. 9-1, at 181). Even if the Client and Margin Agreements were assignable under New York law without Pershing's consent, this language would not indicate that Pershing intended the Client and Margin Agreement to be "freely and unilaterally assignable." (Reply, Dkt. 11, at 6). This provision merely states that the Client and Margin Agreements would bind the assigns in the event the contract were properly assigned. *See Nassau Hotel Co. v. Barnett &*

---

[5] Interestingly, Fulcrum sings a different tune in its amended statement of claims. (Am. Statement Claims, Dkt. 5-1, at 23 ("Pershing extended credit to customers to enable them to purchase CDs. Pershing provided loans and margin financing for Stanford customers to purchase CDs, and Pershing received interest on such loans.")).

10

*Barse Corp.*, 147 N.Y.S. 283, 286 (App. Div.) (holding that the credit contract at issue was not assignable, notwithstanding a provision within the agreement that stated "[t]his agreement shall inure to the benefit of and bind the respective parties hereto, their personal representatives, successors, and assigns," because "a party has the right to the benefit contemplated from the character, credit, and substance of him with whom he contracts."), *aff'd*, 106 N.E. 1036 (N.Y. 1914). Thus, the language in the Client and Margin Agreements binding future assigns does not endorse unilateral assignment, nor does it indicate that the Client and Margin Agreements were assigned to Fulcrum.

Ultimately, the argument that the PSAs assigned the Client and Margin Agreements to Fulcrum is unavailing. Thus, Fulcrum cannot rely on the arbitration provision within the Client and Margin Agreements to compel arbitration.

### 3. Estoppel

Fulcrum also relies on an estoppel theory to compel arbitration. (Resp., Dkt. 9, at 8). Fulcrum's main argument is that Pershing should be estopped from avoiding arbitration because Fulcrum's claims against Pershing "flow directly from the [Client and Margin Agreements]." (*Id.* at 9). Fulcrum further alleges that Pershing "puts the existence of a [Client and Margin Agreement] between itself and the original CD owner as a threshold, determinative fact issue" by pointing to various disclaimers of liability in the Client and Margin Agreement as a defense to Fulcrum's claims. (*Id.*). According to Fulcrum, Pershing is estopped from claiming the benefits of the Client and Margin Agreement—by relying on the Client and Margin Agreement as a "shield against liability"—while resisting its arbitration provision. (*Id.*).

The Court first notes that it is "black letter law that an obligation to arbitrate can be based only on consent." *Sokol Holdings, Inc. v. BMB Munai, Inc.*, 542 F.3d 354, 358 (2d Cir. 2008). A party gives up the right of access to a court of law in favor of arbitration "only by making a commitment to arbitrate." *Id.* "Most frequently such a commitment is made either by entering into an agreement

11

to arbitrate or by entering into a relationship which is governed by an agreement to arbitrate." *Id.* Fulcrum does not argue that Pershing ever entered into a written arbitration agreement to arbitrate the disputes between them. (*See* Resp., Dkt. 9, at 8–10). Nevertheless, Fulcrum contends Pershing should be estopped from avoiding arbitration because Fulcrum's claims against Pershing "flow directly from [the Client and Margin Agreements]" between Pershing and the underlying investors, which do contain arbitration agreements. (*Id.* at 9).

In cases like this one, a nonsignatory seeking to arbitrate with an unwilling signatory may do so under what has been called an "alternative estoppel theory." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003). This theory of estoppel "takes into consideration 'the relationships of persons, wrongs and issues.'" *Id.* (quoting *Choctaw Generation Ltd. P'ship v. Am. Home Assur. Co.*, 271 F.3d 403, 406 (2d Cir. 2001)). Courts are willing to estop a signatory to an arbitration agreement from avoiding arbitration with a nonsignatory on an alternative estoppel theory "where a careful review of 'the relationship among the parties, the contracts they signed . . . , and the issues that had arisen' among them discloses that 'the issues the nonsignatory is seeking to resolve in arbitration are intertwined with the agreement that the estopped party has signed.'" *JLM Indus., Inc. v. Stolt-Nielsen SA*, 387 F.3d 163, 177 (2d Cir. 2004) (quoting *Choctaw*, 271 F.3d at 406). But the Second Circuit has cautioned that "in addition to the 'intertwined' factual issues, there must be a relationship among the parties of a nature that justifies a conclusion that the party which agreed to arbitrate with another entity should be estopped from denying an obligation to arbitrate a similar dispute with the adversary which is not a party to the arbitration agreement." *Sokol Holdings*, 542 F.3d at 359.

Here, the Court concludes that Pershing should not be bound to arbitrate at Fulcrum's insistence under an alternative estoppel theory. Fulcrum does not allege that Pershing breached any

12

provision of the Client and Margin Agreement[6] and its claims against Pershing are not otherwise "intertwined with" that agreement, "an essential condition to a finding of estoppel." *See Sokol*, 542 F.3d at 354 (discussing cases in which the court compelled a signatory to arbitrate with a nonsignatory on an estoppel theory and noting that "[i]t was, of course, essential in all of these cases that the subject matter of the dispute was intertwined with the contract providing for arbitration"); *see also Thomson-CSF, S.A. v. Am. Arbitration Ass'n*, 64 F.3d 773, 779 (2d Cir. 1995) (noting that alternative estoppel cases "all involve claims which are integrally related to the contract containing the arbitration clause"). Instead, Fulcrum's claims arise from its allegation that "Pershing gave material assistance to Stanford in what was ultimately a massive fraud involving the CD program" and "did so despite its inside knowledge of facts that would have prevented any responsible corporation from doing business with SGC and SIB." (Mot. Dismiss, Dkt. 10, at 2). This allegation is not integrally related to the Client and Margin Agreement, the contract containing the arbitration clause.

Moreover, there is no relationship between Pershing and Fulcrum that could support the conclusion that Pershing had "consented to extend its agreement to arbitrate to [Fulcrum]," or that it would be unfair to allow Pershing to refuse to arbitrate with Fulcrum simply because Fulcrum was not a party to Pershing's arbitration agreement. *Sokol Holdings*, 542 F.3d at 362. When courts have compelled a signatory to arbitrate claims brought by a nonsignatory to a contract, they tend to require a relationship between the nonsignatory and the parties to the contract, "consistent with the black letter rule that the obligation to arbitrate depends on consent." *Id.* at 361. There is no similar relationship here to justify a conclusion that Pershing, "the party which agreed to arbitrate with

---

[6] While Fulcrum brings a breach of contract claim against Pershing, it does so on the basis of "express or implied contracts with Claimants, and other agreements to which Claimants were a third-party beneficiary (such as NASD/FINRA Member agreements)." (Am. Statement Claims, Dkt. 5-1, at 90). It does not mention the Client and Margin Agreement, the agreement containing the arbitration provision upon which Fulcrum relies. (*See id.*).

another entity[,] should be estopped from denying an obligation to arbitrate a similar dispute with [Fulcrum,] the adversary which is not a party to the arbitration agreement." *Id.* at 359. Fulcrum and Pershing never had a corporate relationship and were never affiliates, agents, or related business entities. *See Ross v. Am. Exp. Co.*, 547 F.3d 137, 144 (2d Cir. 2008) ("[C]ases which have applied estoppel against a party seeking to avoid arbitration have tended to share a common feature in that the non-signatory party asserting estoppel has had some sort of *corporate* relationship to a signatory party; that is, this Court has applied estoppel in cases involving subsidiaries, affiliates, agents, and other related business entities."). The Client and Margin Agreement never mentions Fulcrum and Fulcrum had no role in its formation or performance. *See id.* at 146. Indeed, the parties were strangers until Fulcrum purchased SIBL CD-related claims from Pershing's former clients and initiated seven FINRA arbitrations. *See id.* ("[A]rbitration is a matter of contract and, contractually speaking, the plaintiffs do not know Amex from Adam. Amex therefore cannot avail itself of the arbitration agreements contained in the cardholder agreements.").

Accordingly, there is no relationship between Pershing and Fulcrum sufficient to justify the conclusion that Pershing consented to extend its agreement to arbitrate to Fulcrum or that it would be unfair for Pershing to refuse to arbitrate with Fulcrum. *See Sokol Holdings*, 542 F.3d at 361. Fulcrum can therefore not rely on an alternative estoppel theory to compel Pershing to arbitrate.

To the extent Fulcrum argues that Pershing is estopped from claiming the benefits of the Client and Margin Agreement while resisting its arbitration provision, it has not provided any authority indicating that New York courts have applied a direct-benefit estoppel theory to this context. (*See* Reply, Dkt. 11, at 8). While courts have bound *unwilling nonsignatories* to arbitration agreements under this estoppel theory—i.e., because the nonsignatory directly benefited from the agreement containing the arbitration provision—this context is different in crucial ways. *See Thomson-CSF*, 64 F.3d at 778.

Here, a willing nonsignatory (Fulcrum) seeks to arbitrate with an unwilling signatory (Pershing). *See Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003) (noting that this "distinction . . . is decisive; it matters whether the party resisting arbitration is a signatory or not."). As discussed above, a willing nonsignatory seeking to arbitrate with an unwilling signatory may do so under what has been called an "alternative estoppel theory,"[7] which hinges on the "relationships of persons, wrongs and issues." *Merrill Lynch Inv. Managers v. Optibase, Ltd.*, 337 F.3d 125, 131 (2d Cir. 2003). Courts have estopped unwilling nonsignatories from avoiding arbitration upon a showing that the nonsignatory directly benefitted from an agreement with an arbitration clause. *See Deloitte Noraudit A/S v. Deloitte Haskins & Sells, U.S.*, 9 F.3d 1060, 1064 (2d Cir. 1993) (holding that a nonsignatory was estopped from avoiding arbitration because it accepted a copy of and directly benefitted from an agreement containing an arbitration clause); *c.f. Oppenheimer & Co. Inc. v. Deutsche Bank AG*, 2010 WL 743915, at *2 (S.D.N.Y. Mar. 2, 2010) (declining to compel an unwilling nonsignatory to arbitrate under an estoppel theory for lack of direct benefit); *Phoenix Companies, Inc. v. Abrahamsen*, 2006 WL 2847812, at *7 (S.D.N.Y. Sept. 28, 2006) (declining to estop a nonsignatory from refusing to arbitrate without a showing that the nonsignatory directly benefitted from an agreement containing an arbitration clause). But the Court is unaware of authority suggesting a nonsignatory may force an unwilling signatory to arbitrate on an estoppel theory

---

[7] By contrast, a willing signatory seeking to arbitrate with an unwilling nonsignatory "must establish one of the five theories described in *Thomson-CSF*, 64 F.3d at 776–80," one of which is estoppel. *Merrill Lynch*, 337 F.3d at 131; *see also Thomson-CSF*, 64 F.3d at 776 (acknowledging estoppel as one of the five theories used to bind an *unwilling nonsignatory* upon a showing that the nonsignatory knowingly benefitted from the contract containing the arbitration agreement) (emphasis added).

requiring a direct benefit. Thus, the Court will not compel Pershing to arbitrate Fulcrum's claims on this iteration of estoppel either.[8]

Therefore, Pershing has demonstrated that there is a substantial likelihood that it will prevail on the merits. The Court finds that Pershing has persuasively argued that Fulcrum lacks a basis upon which to compel arbitration because the PSAs do not manifest an intent to transfer the Client and Margin Agreements and the accompanying arbitration agreement to Fulcrum. And Fulcrum's estoppel arguments fail because its claims against Pershing are not intertwined with the Client and Margin Agreements and because the relationship between them did not develop in a manner that makes it unfair for Pershing to claim that its agreement to arbitrate runs only to the underlying investors and not to Fulcrum. *See Sokol Holdings, Inc*, 542 F.3d at 361. Having made this determination, the Court will proceed to the remaining preliminary injunction requirements.

### B. Remaining Preliminary Injunction Requirements

Pershing has also met the remaining elements for a preliminary injunction. First, "courts have consistently found that a party will suffer irreparable harm if it is forced to participate in an arbitration where the dispute is not subject to an agreement to arbitrate." *Pershing LLC v. Bevis*, 2014 WL 1818098, at *4 (M.D. La. May 7, 2014), *aff'd sub nom. Pershing*, 606 F. App'x at 754. Because Pershing has established a likelihood of success on the merits that it is not obligated to arbitrate Fulcrum's claims, it has shown it will suffer irreparable harm if forced to arbitrate. *See id.* Second, the balance of equities weighs in Pershing's favor. The harm Pershing would suffer if forced to arbitrate

---

[8] Even if a "direct benefits" estoppel theory applied to this context, Fulcrum's argument that Pershing "invoked the [Client and Margin Agreement] and its arbitration provision" in its answer in the *Thorn* arbitration as a "shield against liability" would be unpersuasive. (Resp., Dkt. 9, at 9). In its answer, Pershing stated at the outset that it objected to arbitration and was submitting an answer only to comply with FINRA deadlines "subject to and without waiver of its right to seek a judicial determination of whether these claims are arbitrable and whether the Panel has jurisdiction to hear the claims advanced by Fulcrum Capital, LLC." (Answer Am. Statement Claims, Dkt. 9-1, at 104; *see also* Farrell Decl., Dkt. 5-1, at 2–3 ("No substantive activity has occurred before any arbitration panel in any of these seven cases, and Pershing has not in any way submitted Fulcrum's claims to FINRA's jurisdiction for resolution.")).

16

claims it did not agree to arbitrate outweighs any harm Fulcrum would suffer in the form of potential litigation costs. *See id.*

Finally, an injunction would not disserve the public interest. Indeed, "[c]ompelling arbitration where Pershing has not agreed to do so would be in contravention of public policy." *Id.* Compelling a party who has not entered into an arbitration agreement to arbitrate would "undermine the longstanding principle that arbitration is a consent-based process through which parties can decide for themselves where and how to resolve a specific set of potential disputes." *Raymond James Fin. Servs., Inc. v. Cary*, 709 F.3d 382, 388 (4th Cir. 2013). Indeed, "compelling arbitration when parties have not agreed to do so would discourage entities from agreeing to arbitrate at all out of fear that such agreements would be stretched too far in the course of judicial construction." *Id.* Thus, Pershing has satisfied the remaining preliminary injunction requirements.

## IV. MOTION TO DISMISS

Fulcrum has also filed a motion to dismiss this case, contending that this Court is not the proper venue for the parties' dispute. (Mot. Dismiss, Dkt. 10, at 1). In support of this motion, Fulcrum marshals the same arguments used to oppose Pershing's motion for a preliminary injunction, specifically that Pershing must arbitrate with Fulcrum under the Client and Margin Agreement's arbitration provision and that Pershing is estopped from avoiding arbitration because Fulcrum's claims "flow directly from the Client Agreements." (*Id.* at 8–10). The Court has already found these arguments unpersuasive and denies Fulcrum's motion to dismiss for improper venue for the reasons already discussed.

## V. CONCLUSION

For the reasons discussed above, **IT IS ORDERED** that Pershing's motion for a preliminary injunction, (Dkt. 5), is **GRANTED**. Fulcrum is enjoined from pursuing its arbitration claims against Pershing in the FINRA arbitrations while this case is pending.

17

**IT IS FURTHER ORDERED** that Fulcrum's motion to dismiss, (Dkt. 10), is **DENIED**.

**SIGNED** on July 9, 2020.

_____
ROBERT PITMAN
UNITED STATES DISTRICT JUDGE