## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TEXAS
## AUSTIN DIVISION

| | | |
|---|---|---|
| **PERSHING LLC,** | § | |
| | § | |
| *Plaintiff,* | § | |
| | § | |
| **v.** | § | **Case No. 01:20-cv-00587-RP** |
| | § | |
| | § | |
| **FULCRUM CAPITAL HOLDINGS,** | § | |
| **LLC and FULCRUM CREDIT** | § | |
| **PARTNERS LLC,** | § | |
| | § | |
| *Defendants.* | § | |

## DEFENDANTS' ANSWER AND COUNTERCLAIM

Defendants (collectively "Fulcrum" or "Defendants") file this Answer and Counterclaim. and respectfully show as follows:

## <u>ANSWER</u>

Defendants file this answer subject to their previously filed Motion to Dismiss based on Fed.R.Civ.P. 12(b)(3).

1. This paragraph does not contain allegations against defendants that can be admitted or denied.  To the extent that there are factual allegations, defendants deny them.

2. Admit.

3. Admit.

1

4.  Admit.

5.  Deny that the Court has jurisdiction over this matter, the rest of the paragraph is admitted.

6.  Admit.

7.  Deny.

8.  This paragraph does not contain allegations against defendants that can be admitted or denied.  To the extent that there are factual allegations, defendants deny them.

9.  This paragraph does not contain allegations against defendants that can be admitted or denied.  To the extent that there are factual allegations, defendants deny them.

10. This paragraph does not contain allegations against defendants that can be admitted or denied.  To the extent that there are factual allegations, defendants deny them.

11. This paragraph does not contain allegations against defendants that can be admitted or denied.  To the extent that there are factual allegations, defendants deny them.

12. This paragraph does not contain allegations against defendants that can be admitted or denied.  To the extent that there are factual allegations, defendants deny them.

13. Admit the first sentence.  Everything else is denied or contains a conclusion of law.

14. Admit the first sentence.  Defendants lack knowledge sufficient to admit or deny the rest of the paragraph.

15. Admit.

16. Deny.

17. Admit the first two sentences.  The last sentence is denied.

18. Admit.

19. Admit the first two sentences, all other sentences are denied.

20. Admit.

21. Defendants lack personal knowledge sufficient to admit or deny this paragraph.

22. Deny.

23. Admit.

24. Admit.

25. Admit.

26. Deny the first sentence.  Admit the second sentence.

27. Admit the first sentence.  Deny the second sentence.

28. Deny.

29. This paragraph is legal argument.  To the extent that it can be admitted or denied, defendants deny the legal conclusions.

30. This paragraph is legal argument.  To the extent that it can be admitted or denied, defendants deny the legal conclusions.

31. This paragraph is legal argument.  To the extent that it can be admitted or denied, defendants deny the legal conclusions.

32. This paragraph is legal argument.  To the extent that it can be admitted or denied, defendants deny the legal conclusions.

33. This paragraph is legal argument.  To the extent that it can be admitted or denied, defendants deny the legal conclusions.

34.-46.  These paragraphs are the legal claims and arguments.  To the extent that they can be admitted or denied, defendants deny the legal claims.

## **AFFIRMATIVE DEFENSES**

The dispute between Plaintiff and Defendants is subject to an arbitration agreement.

Plaintiff waived its right to raise its arguments in court because it already submitted them in arbitration.

This Court lacks subject matter jurisdiction because the claims must be arbitrated.

Plaintiff's claims are barred by the doctrine of unclean hands.

## COUNTER-CLAIM OF FULCRUM CREDIT PARTNERS LLC

Defendant and Counter-Plaintiff Fulcrum Credit Partners LLC ("Fulcrum Credit") brings its counter-claim and will show as follows:

## INTRODUCTION

1.     In February 2009, Stanford Group Company ("SGC") and Stanford International Bank Limited ("SIBL") were raided and shut down by federal authorities amid allegations that the entities had violated federal securities laws. Five principals of the Stanford companies were indicted on multiple counts of fraud; two of the individuals pleaded guilty and the other three were convicted by juries after lengthy trials.

2.     At the time of the raid, SGC had investor accounts totaling approximately $10 billion.  Pershing was the custodian for those accounts and received large fees for its work with the Stanford companies.  Another $7 billion, consisting of CD deposits and accrued interest, were reflected on the books of SIBL. Pershing gave material assistance to Stanford in what was ultimately a massive fraud involving the CD program.  Pershing did so despite its inside knowledge of facts that would have prevented any responsible corporation from doing business with SGC and SIBL.

3.     During the criminal trials, federal prosecutors made it clear that thousands of employees and investors were deceived about the true nature of SGC, SIBL and the program to sell CDs.  Pershing played a major role in that deception as it actively told Stanford financial advisors that it had conducted extensive due diligence on the Stanford companies and was very "satisfied" with SIBL.  Pershing often described its relationship with Stanford as a partnership and worked to grow the business of Stanford.   Pershing also worked as a conduit to SIBL, wiring over $500,000,000.00 of its customers' funds for the purchase of CDs, in addition to moving millions of dollars via checks and transfers through intermediary banks.

4.     Internally, however, Pershing did not believe that the CD program was legitimate.  Pershing did not believe that the representations in the sales literature were true, it did not believe the conclusions of SIBL's auditor, and it did not see how SIBL could generate the returns it promised investors.  The belief that Stanford was running a fraudulent scheme was so strong that Tres Arnett, a Managing Director and Senior Managing Counsel for Pershing, ultimately wrote an internal report admitting that Pershing had been concerned for some time about the CD program. This view was shared by other corporate officers – Pershing's Chief Financial Officer and Credit Risk Manager -- who had been suspicious of the fraud since at least 2006.  Despite this, Pershing continued to partner with Stanford's management, providing validation and assistance to the fraudulent scheme.  Pershing's unflinching

support for Stanford continued until the very end, when it sent a comfort letter to financial advisors in December 2008 exuding confidence in the ongoing relationship with Stanford.  As a result, thousands of investors suffered massive financial losses. Many of those investors assigned their rights to bring claims against Pershing to Fulcrum Credit Partners LLC, counter-plaintiff in this action.

## I.   PARTIES

5.      Counter-Plaintiff Fulcrum Credit is a limited liability company formed under the laws of the State of Delaware.  Fulcrum Credit has its principal place of business in the State of Texas.  Through an agreement referred to as the "Purchase, Sale and Assignment Agreement" ("PSA Agreement"), Fulcrum Credit was assigned the rights and remedies of certain investors who had purchased the SIBL CD (the "Fulcrum Investors"), including the right to bring any claim or lawsuit that the Fulcrum Investors had for their losses.  As a result of this assignment of claims and transfer of rights, Fulcrum Credit stands in the shoes of the Fulcrum Investors and is bringing this lawsuit as assignee of the Fulcrum Investors' claims against Pershing.[1]

---

[1] The reference to "investors" in this counter-claim is inclusive of the Fulcrum Investors.

6.      Counter-Defendant Pershing LLC ("Pershing") is a Delaware limited liability company doing business in Texas, and with its principal place of business in New Jersey.   Pershing's registered agent in Texas is Corporation Service Company, at 701 Brazos Street, Suite 1050, Austin, Texas 78701.   Pershing is a registered broker-dealer, and it is authorized to conduct business, and on information and belief, does conduct business, in Texas.

## II.      JURISDICTION & VENUE

7.      This Court has original jurisdiction over this proceeding pursuant to 28 U.S.C. §1332.   The matter in controversy exceeds the sum or value of $75,000, exclusive of interests and costs, and is between citizens of different States.   For diversity purposes, Pershing is a citizen of Delaware and New York.   Fulcrum Credit, for diversity purposes, is a citizen of Texas.

8.      This Court has personal jurisdiction over non-resident Pershing under the Texas Long Arm Statute and because it has submitted to the jurisdiction of this Court in bringing this lawsuit.   Pershing has conducted continuous and systematic business in the State of Texas for many years and is therefore subject to general jurisdiction.   Furthermore, as described herein, Pershing has engaged in specific jurisdiction contacts with the State of Texas, specifically with Stanford Financial Group, including Stanford Group Company, headquartered in Houston, Texas, that

give rise to Plaintiffs' causes of action, and therefore Pershing has done business and committed torts, in part, in the State of Texas.

9.     Venue is proper under 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims occurred within this district, defendants reside within the district, and pursuant to Fed.R.Civ.P. 13.

## III.   BACKGROUND FACTS

### A.   The Stanford CD

10.     In 1986, Allen Stanford began operating an international bank from the Caribbean island of Montserrat.  Initially named Guardian International Bank, the bank was subsequently moved to Antigua, a Caribbean Island that is part of the nation of Antigua and Barbuda.  The bank was renamed Stanford International Bank Limited ("SIBL").  During the years that followed, Allen Stanford established additional financial service companies that had clientele throughout the world.[2] Stanford Group Company ("SGC") was one such company.   SGC was a broker/dealer that began its U.S. operations in 1995.  SIBL and SGC experienced consistent and impressive growth – by 2008, SIBL's records showed over $7 billion

---

[2] Ultimately, there were more than 80 operating companies worldwide.  To avoid confusion, the companies will be referred to collectively in this counter-claim as the "Stanford Financial Group," "Stanford companies" or "Stanford."  Allen Stanford will be referred to as "Allen Stanford."

in customer deposits and SGC had more than $10 billion in assets held in its customers' brokerage accounts.

11.    While SGC offered a wide array of brokerage products, including traditional stocks, bonds and mutual funds, SIBL offered essentially one product, a certificate of deposit.  Many SGC financial advisors introduced the CD to their qualified clients.  SIBL paid a referral fee to SGC which, in turn, gave the financial advisors a commission.

12.    The SIBL CD was unlike conventional CDs issued by U.S. banks. Funds received from investors were pooled and purportedly invested in various investments.  The sales literature for the CD touted the product's safety.  Purchasers were told that money from the sale of CDs was allocated in a portfolio that contained equity, fixed income, alternative investments and precious metals.  SIBL's annual report generally described the portfolio with some details about the investments, although the exact holdings of the portfolio were not disclosed to the financial advisors and investors.[3]  Investors were also told that the portfolio was managed by several European money managers.

13.    In 1998, Stanford Financial Group established SFIS, a representative office of SIBL in Miami.  The Miami office of SFIS generated over $1 billion in

---

[3] Financial advisors and investors were told that the portfolio was traded on the basis of a proprietary system that would lose its advantage if individual holdings were divulged.

SIBL CD sales for Stanford Financial Group, primarily from sales to investors from South American countries such as Colombia, Ecuador, Peru, and Venezuela. Stanford Financial Group also set up SFIS offices in Houston and San Antonio, Texas to cater to Mexican investors visiting those cities and bring in more investment money.

14.     Stanford Financial Group also increased sales of SIBL CDs by targeting the IRA accounts of SGC's U.S. investors.  In 1998, Stanford Financial Group established STC in Baton Rouge, Louisiana to serve as the trustee/custodian for IRA accounts owned by investors referred from SGC — a service that traditional IRA custodians would *not* provide.  After STC was established, SGC's brokers and investment advisers convinced the IRA investors to invest some of their IRA accounts into the SIBL CDs.

15.     These promoter companies – SGC, SFIS and STC – were all members of the Stanford Financial Group, were ultimately owned by Stanford himself, were interconnected via intercompany marketing and referral fee agreements, and were controlled by Stanford Financial Group in Houston, Texas.

**B.    Rapid Growth of the CD Program**

16.     In November 1998, Stanford Financial Group needed new capital to sustain its Ponzi scheme, so SIBL filed a Regulation D exemption with the United States Securities and Exchange Commission ("SEC").  Stanford Financial Group used

this exemption to sell SIBL CDs to U.S. "accredited investors" in the United States without registering them as securities. SIBL's initial Reg. D filing listed CD offerings totaling only $50 million.

17. After the initial Reg. D filing in 1998, Stanford Financial Group began to exploit U.S. investors and its empire grew exponentially. SIBL filed an amended Reg. D in November 2001 to increase the CD offering amount to $150 million. SIBL filed two additional amendments in 2004 (March and then November) increasing the size of SIBL's offering to $200 million and then to $1 *billion*, clearly evidencing the mass sales of SIBL CDs taking place in the United States. Finally, in November 2007, SIBL filed yet another Reg. D amendment to increase the size of the offering to *$2 billion*. During those years, Stanford Financial Group sold CDs under the Reg. D offering to well in excess of 1,000 investors.

18. By 2003, Stanford Financial Group had printed and distributed to its FAs some 30,000 offering brochures for SIBL CDs. In 2005, Stanford Financial Group began an intensive television advertising campaign in the United States, designed to promote the sale of SIBL CDs, which aired continuously until Stanford Financial Group collapsed in 2009. By March 2006, Stanford Financial Group had distributed 4,424 SIBL CD "Accredited Investor" subscription agreements to investors under the Reg. D offering.

**C.    The Fraud**

19.    The above representations about SIBL's portfolio, furnished to financial advisors and investors, were clearly false.  What the financial advisors and investors did not realize was that the funds were not invested as described in the literature.  Almost all of SIBL's funds were invested in private companies, real estate, and a $2 billion loan to Allen Stanford.   In short, Stanford employees and investors were deceived about Stanford's business model, investment strategy, financial strength and the safety and nature of the investments.

20.    None of the investors' money was segregated.  Instead, all investor money was commingled and then sprinkled across all kinds of purported investments, including private equity investments in the various companies that comprised Stanford Financial Group.  As such, Stanford Financial Group was violating the Investment Company Act by operating as an unregistered outlaw hedge fund and selling its internal securities product from Houston, Texas to Plaintiffs and other investors.   Additionally, Section 47(b) of the Investment Company Act provides:

> A contract that is made, or whose performance involves, a violation of this [Investment Company] Act, is unenforceable by either party to the contract who acquired a right under the contract with knowledge of the facts by reason of which the making or performance violated or would violate any provision of this Act . . . unless a court finds that under the circumstances enforcement would

produce a more equitable result than nonenforcement and
would not be inconsistent with the purposes of this Act.

15 U.S.C. § 80a-46.

21.     Stanford Financial Group was never registered nor authorized to
operate as an investment company in the United States, a fact that was never
disclosed to the Fulcrum Investors, who were consistently and uniformly told
verbally and via Stanford Financial Group promotional materials that, e.g., the
Stanford Financial Group based in Houston, Texas was compliant, authorized, and
regulated by the SEC and Financial Industry Regulatory Authority ("FINRA"), and
backed by insurance coverage from the Securities Investor Protection Corporation
("SIPC") and Lloyd's of London.  Plaintiffs and other investors were never told the
material fact that the acts of Stanford Financial Group and its unregistered
investment company were *void as a matter of law* under Section 47 of the Investment
Company Act.

22.     In order to mask the fraud, revenue figures for SIBL's assets were
"reverse engineered" to arrive at desired levels.  James Davis, the Chief Financial
Officer of Stanford Financial Group Limited ("SFGL"), oversaw the fabrication of
the SIBL financial statements.  After it was determined what level of revenue SIBL
was needed to report in order to look good to investors, Davis' team would back into
that total amount by assigning fictitious revenue amounts to each category (equity,
fixed income, precious metals, alternative) of a fictitious investment allocation.

Laura Pendergest-Holt, the Chief Investment Officer of SFGL, Gil Lopez and Mark Kuhrt, SFGL accountants, and Allen Stanford, CEO and the ultimate shareholder of SIBL and SGC, were all implicated in the fraud. Davis and Holt pled guilty to federal charges and served sentences of five years and three years, respectively. Lopez, Kuhrt and Stanford were each found guilty following lengthy trials and were sentenced to 20 years (Lopez and Kuhrt) and 110 years (Stanford).

**D.      The SIBL CDs Were Required to Be Registered But Were Not**

23.      This Ponzi scheme involved the sale, through an illegal, unregistered public offering, of SIBL CDs by SGC from Texas to investors in Texas, other States, and worldwide.

24.      The offering of SIBL CDs, conducted on a continuous basis from at least 2005 through 2008, was described in offering materials as a private placement, in which SGC purportedly offered the CDs under a federal registration exemption, Reg. D, which also purportedly applied in Texas and Florida under applicable state law.

25.      However, the offering of CDs was in fact an unregistered public offering made in violation of Article 581 of the Texas Act. It was an integrated offering under Texas securities laws, and on information and belief, involved each of the following factors indicating that it was a public offering and not a private offering exempt from registration:

- The integrated offering involved general solicitation. This general solicitation by SIBL through SGC and its U.S. affiliates, agents and brokers included general public advertisements, publicly distributed magazine articles and other communications and media published in print and distributed broadly for general distribution in the United States (including in Texas) to offerees and purchasers of the CDs. SIBL has acknowledged that it employed marketing literature other than its private placement memorandum on a regular basis.

- The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas, of the Stanford Financial products, including SIBL CDs.

- The integrated offering involved seminars and meetings conducted in the United States (including Texas) and Antigua, West Indies. The integrated offering was conducted through sales seminars, "road shows", and meetings directed at potential offerees and purchasers. These meetings took place in the United States (including Texas) and in Antigua.

- The integrated offering involved offers to thousands of offerees and purchases by thousands of offerees. The integrated offering involved offers to, and purchases by, at least hundreds of Texas residents or those otherwise subject to Texas law.

- The aggregate size of the sales of SIBL CDs during this period was several billion dollars.  The aggregate size of the sales in Texas during this period was at least several hundred million dollars.

- The offering was made to investors with whom SGC had no pre-existing relationship.

### E.     The SGC Sales Force

26.     Pulling off a fraud on this scale required hiring a credible sales force who could be misled into placing CDs with an unknowing public.  SGC hired reputable financial advisors, many of whom worked at major Wall Street firms, and deceived them with the financial information fabricated by Davis and his team.  This deception was reinforced through the efforts of Pershing, as detailed below.  By 2008, the CD had been offered for more than two decades with apparent approval by regulators and industry insiders such as Pershing.  All of this reinforced the notion that the CD was a bona fide product.

### F.     The Pershing-Stanford Relationship

27.     In May 2005, Pershing began discussions with Stanford management about taking over the role as custodian and clearing firm for SGC.

28.     One of the earliest meetings between Pershing and Stanford personnel took place at Pershing's headquarters in New Jersey.  Pershing's senior management was involved in forging the relationship with Stanford.   Claire Santaniello,

17

Pershing's Chief Compliance Officer, and John Ward, a Managing Director, were two of the principals involved in the New Jersey meeting.

29.     To further the partnership, Pershing agreed to provide a service to Stanford that was above and beyond the clearing and custody of securities: ***international wire transfers for the purchase and redemption of SIBL CDs by SGC customers.***

30.     SGC told Pershing that it would need Pershing to wire money from clients' accounts for the purchase of CDs.  On October 12, 2005, John Ward sent an email confirming to Stanford that, as to the wire transfer business between SGC and SIBL, ***"[w]e fully understand the nature of the relationship and the reason for these movements."***

31.     Pershing agreed to support the CD program as part of their ongoing relationship with Stanford.  Following its due diligence on Stanford, Pershing wrote:

> **"The driver in the SFG model is to refer investors to SIB."**
>
> **"SIB is the jewel of the Stanford companies."**
>
> **"2/3 of SGC's revenue comes from SIB."**
>
> **"We understand that there will be active wire activity between all accounts."**
>
> **"Some SGC clients might wire funds from their brokerage accounts to buy CDs."**

32.     Pershing Vice President Ron Artzi sent an email stating that Pershing was *"excited to have the opportunity to partner"* with Stanford Financial, and that Pershing representatives were confident that they *"thoroughly understand the unique compliance and legal requirements associated with servicing"* the Stanford business.

## G.     Pershing Became Aware of Suspicious Activities During Its Due Diligence of Stanford in 2005

33.     Eager for Stanford's business, Pershing spent eight months conducting due diligence on SGC, SIB and related entities.  Pershing undertook an investigation of the broker-dealer, including its business model, client base, type of investments, transactional volume, its financial position, its management, any specific needs related to custody of the assets, and any other information that might be relevant.

34.     Pershing's due diligence included multiple trips to Antigua.  Pershing met with SIBL personnel and examined the bank's books and records.  Pershing reviewed arbitration and court cases against Stanford companies.  It also reviewed the books of SGC and related companies.  Following the review, Pershing signed a contract to be the clearing firm for SGC in December 2005.  The clearing agreement became operational in early 2006 and was fully implemented in late November 2006.

35.     Throughout this process, Pershing had access to confidential information and became aware of troubling facts about the Stanford business model. For example, Pershing discovered that:

- SGC was being actively investigated by the SEC;

- SGC's survival was dependent on revenues generated by referral fees from marketing and promoting SIBL CDs (CD-related fees constituted 71.65% of SGC's revenue in 2004 and 63.62% in 2005);

- Pershing had never seen the investment portfolio maintained by SIBL;

- Unlike anything Pershing had ever seen before, SIBL showed a profit in good times and in bad;

- The people running SGC did not know what was in the SIBL portfolio;

- Essentially the entire SIBL portfolio was managed by Davis and Holt, neither of whom had the education or training to manage such a massive portfolio;

- The financial condition and financial statements of SIBL were audited by a one-man accounting firm in Antigua, C.A.S. Hewlett & Co., Ltd. – an accounting firm that no one at Pershing had ever heard of;

- Financial regulators in Antigua (the Financial Services Regulatory Commission, or "FSRC") had no work papers or documentation supporting the assets that SIBL claimed to own;

- It was the regular practice of the FSRC to just accept at face value whatever SIBL told the FSRC about its financial condition and portfolio values; and

- Stanford forfeited more than $3 million in deposits linked to a Mexican drug lord.

36.     From a regulatory perspective, Pershing learned that Stanford Financial Group had not registered the SIBL CDs for sale in the United States, and that SGC was selling the CDs under a Reg. D exemption.  Upon information and belief, Pershing reviewed SIBL's Reg. D filings, and knew that SIBL had amended its Reg. D filing in November 2004 to increase the dollar amount of the CD offering from $200 million (as stated in SIBL's March 2004 Reg. D filing) to *$1 billion*, an increase of $800 million (or 400%) in 8 months.   Pershing also knew that SGC had sold the CDs to more than 500 investors in the U.S.  Additionally, upon information and belief, Pershing also discovered the SEC's active investigation of Stanford Financial Group during this initial due diligence in 2005, particularly concerning SGC's regulatory and compliance issues.

37.     These red flags created tension at Pershing between those pursuing the relationship and those that believed Stanford was engaged in fraud.  Unfortunately, the business side prevailed and Pershing never took any meaningful action to distance itself from the illegal activities perpetrated by the Stanford companies (until the last two months of Stanford's existence when the writing was on the wall).  Despite these glaring red flags, Pershing recklessly continued to provide substantial assistance to

Stanford by servicing the Stanford companies and transferring millions of dollars of investors' money to purchase CDs and fund the fraudulent scheme.

## H.    Pershing Materially Aided Stanford with the Sale of CDs

38.    Pershing's assistance went far beyond clearing trades and transferring funds for the purchase of CDs.  Pershing took many active steps to promote the sale of CDs and support the business of Stanford.

Pershing Vouched for SIBL

39.    Beginning in 2006, Pershing had meetings with groups of financial advisors, as well as one-on-one meetings in Houston, Baton Rouge, Miami and other locations for the purpose of validating the SIBL CD program.  These meetings were attended by Pershing executives who told financial advisors how excited they were to be working with Stanford.  Relationship managers Ward, Artzi and Zelezen attended these meeting, as did others from Pershing.  Pershing executive Chris Fulco explained that Pershing and Stanford "spoke a common language" because each was affiliated with a bank.  Fulco told financial advisors that about 80% of Pershing's year-long due diligence into Stanford was focused on SIBL because Pershing understood that the CDs were the primary source of revenue for Stanford.  Fulco reported that Pershing made several site visits to the bank in Antigua, that it was given transparency into SIBL and that Pershing was satisfied with what it found.

Fulco told financial advisors that Pershing "dove deeply into the portfolio of the bank."

Pershing Helped Recruit the SGC Sales Force

40.    From 2006 through 2009, Pershing played a central role in the recruiting of preeminent financial advisors to SGC.  Much of Stanford's growth during this time came from a focused effort to recruit top talent from major brokerage firms.  Prior to working at SGC, this select group of financial advisors had successful careers with valued clients.  Relying on representations made to them during the recruiting process, these financial advisors came to believe that the move to Stanford was an opportunity to work in a boutique, full-service environment that catered to their clients.  They had no prior experience with the SIBL CD at their former firms.

41.    As part of the recruiting process, financial advisors were invited to the Houston office where they listened to presentations intended to induce them to come work at SGC.  Pershing personnel, including Ward and Zelezen, participated in the recruiting sessions.  During their presentations, Ward and Zelezen would tell the potential employees about Pershing's partnership with Stanford.  They told the financial advisors that they had vetted the Stanford companies.  Capitalizing on the recognition of Pershing and its parent, Bank of New York Mellon, Ward, Zelezen

and others made clear they were partnering with Stanford after conducting a thorough due diligence examination of the organization.

42.     To the recruits, many of whom had never heard of Stanford before, the support and endorsement by Pershing and Bank of New York gave instant credibility to the Stanford enterprise.  Consequently, the representations of Pershing concerning SIBL carried a tremendous amount of weight and were an integral part of the financial advisors' decision to work at Stanford.

43.     The ranks of financial advisors increased at SGC as a result of Pershing's efforts.  Not surprisingly, the sales of CDs increased as well.  From 2005 through the end of 2008, SIBL reported that its CD deposits had increased from $2.8 billion to more than $7.2 billion.  (By comparison, it took 15 years – from 1986 through 2001 – for deposits to reach $1 billion.)

44.     Pershing's actions cloaked the whole operation with credibility and authority, ultimately influencing the financial advisors' recommendations to buy or hold CDs.

45.     Pershing's CEO, Breukner, even encouraged financial advisors from Pershing's parent, Bank New York Mellon, to move to Stanford.  In 2007, Pershing's parent decided to close its retail brokerage business and its financial advisors began looking for new jobs.  Some advisors were encouraged to consider Stanford, whom they had never heard of.  Consequently, they made inquiries about Stanford.  In

response, the advisors were told by a Pershing board member that Pershing had checked Stanford out and that it was a great company. Richard Breukner advised the financial advisors to "run, not walk" to Stanford. He also explained that Stanford was Pershing's fastest growing client. In order to facilitate the move from Bank New York Mellon to Stanford, Pershing even arranged for the paperless transfer of a number of financial advisors' accounts.[4]

46.    Breukner and others at Pershing told Stanford:

"We are going to grow your business."

"Pershing is more than a vendor."

"We will assist in your growth every way we can."

"We look forward to building a mutually rewarding partnership."

Then Pershing zealously set out to assist Stanford "every way it could."

47.    The ongoing assurance of Pershing was a large factor in decisions to buy and hold CDs. The financial advisors and other employees did not have the same degree of access into the bank's portfolio as Pershing. Being told that Pershing had transparency into the bank and was "satisfied" validated the CD program,

---

[4] Pershing's parent corporation, Bank of New York Mellon, was well familiar with Allen Stanford and SIBL. Allen Stanford opened a personal account with Mellon Bank in 2003. The following year, SIBL became a client of BNY Alternative Investment, Ltd. As part of the due diligence process, Pershing consulted with the Bank of New York.

assuaged any concerns and encouraged the financial advisors to sell more CDs or recommend that their clients hold existing CDs.

Pershing Moved Funds Offshore to Purchase CDs and Onshore to Redeem CDs

48.    Pershing assisted with CD sales by transferring funds from client accounts held at Pershing for CD purchases.   Importantly, Pershing used its professional expertise and discretion in deciding whether to process orders and execute transactions.   Moreover, when investors received money from their CD investments at SIBL (whether it was interest or the return of their principal), Pershing transferred the funds into SGC accounts where Pershing served as clearing agent.   Every time that Pershing transferred funds from SIBL to SGC, Pershing further perpetuated the fraud by giving account holders and their financial advisors the appearance that the CDs were generating returns when, in fact, Pershing doubted that the CD portfolio existed and it questioned how SIBL could be generating any profit.   The transfers by Pershing validated the entire CD program by (1) giving false profits to investors, and (2) furthering the illusion that depositors had security since depositors could withdraw interest or terminate the CD at any time and receive a return of principal.

Pershing Extended Credit to Purchase CDs

49.    Pershing substantially assisted in the sale of SIBL CDs in additional ways.  Upon information and belief, Pershing extended credit to customers to enable

them to purchase CDs.  Pershing provided loans and margin financing for Stanford customers to purchase CDs, and Pershing received interest on such loans. Joseph Spatucci, a Vice-President of Wealth & Credit Management at Pershing, was one of the individuals that routinely worked with financial advisors and operations personnel at SGC to assist investors with financing matters and facilitating transactions.

The Pershing – SIBL Consolidated Statement

50.     Pershing was also involved in a Consolidated Statement project with Stanford that reported to clients the "performance" of the CDs.  The statements gave the false impression that the CD generated returns and was protected by SIPC. Pershing provided a direct feed of its data to Stanford for the creation of the statement, knowing that its data would be reported along with the SIBL CD returns in one, unified statement.  The statement reflected fictitious returns on CDs, returns that Pershing was questioning, and contained the Stanford logo and phrase "member NASD/SIPC" even though Pershing knew the CDs were not insured by SIPC.  This consolidated statement could not have been created without the assistance of Pershing.  At the time of the shutdown, Pershing was evaluating new software with Stanford that would similarly be used to generate consolidated statements.

Pershing Assisted Stanford Outside the United States

51.     Pershing also promoted the Stanford CDs through its actions outside the United States.  Pershing played a large role in the sale of CDs in Latin America. For example, Pershing was the custodian and clearing firm for Stanford's brokerage firms in Latin America.  Pershing routinely wired funds to purchase CDs from client accounts throughout Latin America to an SIBL account at Toronto Dominion in Canada.

Assisted SGC's Operations

52.     Further, Pershing played a substantial role in the operations and compliance of SGC.  Pershing assisted the Managing Directors and their Operations Managers at SGC, consulting on matters that included operations and compliance. Pershing was deeply enmeshed with the Operations Managers at the SGC branches from 2006-2009.  Pershing made it clear that it was there to help facilitate SGC's business and participated in regular meetings and conference calls.  The meetings were held in Houston, Texas, as well as the individual branches.

Pershing's Reporting Duties

53.     Apart from its activities at SGC's offices, Pershing had a duty to monitor the net capital of SGC to make sure it was in compliance with regulatory requirements.  Also, under the Patriot Act, Pershing had a duty to report any suspicious activities that could possibly involve money laundering.  Pershing was

well aware of international transfers to and from SIBL, and admitted in 2009 that it was responsible for at least $500,000,000.00 in transfers offshore. (Pershing has not yet admitted how much more money it transferred from SIBL to other destinations). In short, SIBL could not have done business, including its primary business of selling CDs, without the continuing assistance of Pershing. This assistance was in the form of training management, recruiting financial advisors, lending money to investors, moving funds around the world and staying silent about suspicious activities. And, as demonstrated in the following section, all of this was done while Pershing did not believe that Stanford was acting lawfully.

## I.      Pershing Continued Its Assurances to Financial Advisors Despite  Internally Doubting Everything About the CD Program

54.     While Pershing openly gave assurances to financial advisors, it secretly doubted everything it had reviewed concerning the CD program, including the sales brochures, SIBL's investment portfolio and the ability of SIBL to consistently produce positive returns. Pershing had uncovered many red flags during its initial due diligence period in 2005. Pershing's awareness of the Stanford fraud increased from 2006 through 2009, primarily through the efforts of an internal risk manager at Pershing, Richard Closs. Closs brought the overwhelming evidence of fraud to Pershing's attention, however Pershing refused to take any steps that would interfere with its serving as SGC's custodian and clearing firm. As a result, Pershing

continued to materially aid Stanford until federal regulators closed the firm in February 2009.

55.     Richard Closs began working for Pershing in the middle of 2006. Shortly after arriving at Pershing, Closs was asked to dig deeper into the relationship with Stanford.  Closs reported directly to Pershing's Chief Financial Officer.  As he reviewed financial information about SGC, he became concerned about its relationship with SIBL.  He also became suspicious about SIBL's ability to generate the returns that were being reported.  Pershing noticed in the middle of 2006 that SGC was losing money.  Since SGC was receiving a significant portion of its revenue from SIBL, Pershing was internally concerned about SIBL, capital contributions and the "sustainability" of SGC.

56.     Closs asked SGC about the SIBL portfolio and was directed to Holt in August 2006.  The call took place around August 31, 2006.  During the call, Closs bombarded Holt with questions.  Closs asked for verification of the assets in the SIBL portfolio and the returns it generated.  Holt did not answer Closs' questions and abruptly ended the call.

57.     In the fall of 2006, Closs visited the Houston office of SGC to gather more information.  Pershing was closely monitoring SGC because it was in the red and losing money.  Closs began requesting financial statements from the Chief Financial Officer of SGC.

58.     Closs was also aware of the SEC's investigation into Stanford.  The Chief Compliance Officer at Stanford provided details of the investigation to Closs.

59.     Pershing's suspicions deepened.  In June 2007, Closs requested and obtained the CD disclosure document and subscription agreement.  Closs was most shocked by what he did **not** see in the materials and immediately emailed Stanford's Chief Compliance Officer:   "I was also looking for a list of the underlying investments and where they are held .   .   .   . I would usually see that in the prospectus."

60.     Pershing followed up with a meeting in Miami on June 6, 2007 with SGC's President to discuss the SIBL portfolio.  John Ward attended the meeting with Frank LaSalla, his boss at Pershing.[5]  Ward wrote SGC the next day and said that Pershing was committed to Stanford's growth, but wanted to understand how SIBL could continue to generate returns.  He also said that Pershing needed to "gain an understanding of the SIBL portfolio" – a jarring admission that Pershing did not "dive deeply" into the portfolio as had been represented to financial advisors.

61.     In November 2007, Pershing learned that FINRA fined SGC for distributing sales literature about the CD which contained "misleading, unfair and unbalanced information."  The FINRA action was public and noticed by Pershing

---

[5] LaSalla was a member of the Executive Committee for Pershing and the Operating Committee of Pershing's parent, BNY Mellon.  He was also responsible for all of Pershing's business activities outside the United States.

executives, some of whom were serving on FINRA committees. Coupled with the inside information Pershing had about the Stanford enterprise (which included Stanford's refusal to provide meaningful details about the SIBL portfolio), Pershing's concerns about fraud were escalating.

62.    In January 2008, Pershing representatives, John Ward and Tres Arnett, travelled to Antigua again to examine SIBL's balance sheet and meet with the Antiguan banking authority, the FSRC. On that trip, Pershing did not get to see a balance sheet and it learned that the FSRC had no work papers or any documents of any kind supporting the assets that SIBL claimed to own. Pershing also discovered that it was the regular practice of the FSRC to just accept at face value whatever SIBL told them about the financial portfolio.

63.    Pershing did not trust the one-man auditing firm in Antigua, C.A.S. Hewlett. Pershing wanted financial information that was independent from Hewlett. The Pershing executives said they would be "flexible" in how they got the information and they dropped their earlier demands to see the information first hand. Ward confirmed on March 17, 2008 that Pershing "would accept a certification by a U.S. domiciled recognized accounting firm" that "they have conducted a review of [SIBL's] assets and that in their professional opinion [the assets] are reflected accurately."

64.     Months went by without the desired review by an accounting firm. Pershing said it wanted to see the offering materials reconciled with the investments reflected in SIBL's books, and the SIBL books reconciled with the custodian's records, and it wanted confirmation that the investments were managed by independent managers, not Stanford.[6] The review never took place.

65.     All of this reinforced Pershing's deep suspicions that Stanford was engaged in fraudulent activity.  From at least 2006 onward, senior executives had been internally discussing the red flags that went to the heart of the fraud. Communications among corporate officers and management included the following:

> **"Were actual investments being made at SIB?"**
>
> **"Where did Stanford get his money?"**
>
> **"Where are the funds coming from?"**
>
> **"How are they funding the high rates paid on CDs?"**
>
> **"When will the well run dry?"**
>
> **"Have you found the money?"**
>
> **"When is enough enough?"**

---

[6] Additional concerns surfaced during this period.  In January 2008, two former Stanford employees claimed that Stanford was engaged in fraud involving the falsification of its financial statements.  The SEC began working with the employees and, in the summer of 2008, Bloomberg ran an article discussing the SEC's investigation and the whistleblowers.  Pershing followed these events and contacted Bogar on August 18, 2008 to discuss the press reports.

The knowledge and beliefs of these corporate officers is imputed to Pershing. These concerns were voiced to Tres Arnett, a Managing Director and Managing Counsel at Pershing, who documented the belief that Stanford was engaged in fraudulent activity. Upon information and belief, Arnett took no steps to act upon these red flags and Pershing continued its relationship with Stanford.

66. Subsequent to Mr. Arnett's report, Richard Closs and Pershing's CFO told their fellow executives in a meeting that the only option for Pershing was to terminate the relationship with Stanford. Pershing executives have admitted that "the 800 pound gorilla in the room was the concern that Stanford was a fraud." Despite the red flags and the complete absence of evidence that Stanford was running a legitimate enterprise, Pershing decided to continue assisting Stanford with its scheme.

67. Pershing had no discussions with Stanford about terminating their clearing relationship. Pershing ultimately did nothing to interfere with the fees it got for supporting SGC. In October 2008, Pershing CEO Breukner met with R. Allen Stanford in New York. Later, Pershing sent a letter to Stanford which said: "To Stanford Team: As validated in your meeting with your CEO last week, Pershing remains committed to our partnership with Stanford."

68. Because the evidence of fraud was so glaring, Pershing tried to create the appearance that it had distanced itself from the fraud just before the SEC shut

down Stanford.  The day after Madoff was arrested, Pershing notified SGC on December 12, 2008 that it would no longer process wire transfers to SIBL for the purchase of CDs.  At the same time, however, Pershing agreed to transfer funds to an intermediary bank that would forward the funds to SIBL.  Pershing's change of procedure was illusory and did not stop or correct the fraud that Pershing had assisted for several years.

69.     Importantly, Pershing did nothing to warn its clients about its findings, concerns or doubts.  Nor did Pershing retract earlier representations that it was excited to partner with Stanford.  Instead, Pershing sent a "comfort letter" to financial advisors in December 2008 telling them that *"[a]t Pershing, we take great pride to support your business and make every effort to ensure your client's assets are protected."*  The letter touted Pershing's strength, its layers of insurance protection, BNY Mellon's market capitalization of $32 billion, and the fact that Pershing *"serves many of the world's most respected financial organizations."* Pershing communicated this in the form of a Frequently Asked Questions for Investment Professionals, a Bulletin and a Sample Client Communication.  Pershing has admitted that these communications were intended to increase confidence. Incredibly, these public communications were dated December 12, 2008, the same day that Pershing was privately telling Stanford management it was going to stop transfers to SIBL.

J.     **The Fulcrum Investors were misled**

69.     All of the Fulcrum Investors invested in the Stanford Ponzi scheme by purchasing CDs.  Over the years that Plaintiffs purchased and maintained investments in SIBL, Plaintiffs were repeatedly and uniformly told, either directly by Stanford Financial Group FAs or via Stanford Financial Group promotional materials, that, *inter alia*:  (1) an investment in SIBL was safer than investing in U.S. banks because SIBL did not make loans but instead invested in a portfolio focused on safe and highly liquid instruments; (2) the assets held in SIBL's investment portfolio were more than sufficient to cover any and all CD liabilities;  (3) SIBL was fully and adequately regulated by the Antiguan FSRC; and (4) that an investment in SIBL was completely safe and secure because it was guaranteed and insured by Lloyd's, was audited by an "outside" audit firm and subjected to regular, "stringent" risk management examinations.  All of this was false.

70.     During the time that Plaintiffs purchased and maintained investments in SIBL, Stanford Financial Group sales representatives and promotional materials repeatedly and uniformly omitted to inform Plaintiffs that, *inter alia*: (1) SIBL was not regulated by the U.S. or any other government; (2) Plaintiffs' investments in SIBL were not insured; (3) Stanford Financial Group's sales representatives did not know how SIBL invested depositor funds or what assets comprised SIBL's purported portfolio; (4) Stanford Financial Group was operating illegally as an unregistered investment

company (whose contracts were thus void under § 47 of the federal Investment Company Act of 1940) soliciting and selling unregistered securities by, from and through Houston, Texas; (5) SIBL was not, in fact, a normal and customary bank, but instead operated more like a mutual fund or hedge fund; (6) billions of dollars of SIBL's assets had been used to (i) purchase speculative, illiquid, and high-risk investments, (ii) personally enrich Allen Stanford and other Stanford Financial Group employees, and (iii) maintain the façade of Stanford Financial Group's image of wealth, power, and prestige; and/or (7) that SIBL was not adequately regulated by the FSRC or any other entity and was audited only by a one man "mom and pop" audit shop under the control of Stanford Financial Group.

71.    Based on the representations and omissions of material fact made to the Fulcrum Investors repeatedly and uniformly over the years, Plaintiffs decided to invest money in, and maintain investments in, the SIBL CDs from at least 2006 through 2009.

72.    Pershing assisted Stanford in perpetrating this fraud.  Moreover, if Pershing had told its customers the truth, they would have not purchased CDs, nor would they have held the CDs they owned.  Had Pershing told the truth, there is no question that Stanford financial advisors would have not sold SIBL CDs and they would have left SGC for other firms.  If Pershing put its duties in front of profits, as the law requires it to do, hundreds of millions of dollars in losses could have been avoided.

## IV.    TOLLING:  FRAUDULENTLY CONCEALMENT AND *TURK V. PERSHING*

73.    The false information generated by Pershing spread quickly throughout its customer base, falsely assuaging any concerns of financial advisors and investors, causing more and more investors to invest, hold and reinvest in CDs.  The fraudulent concealment by Pershing of its actions, concerns and the true state of affairs helped to perpetrate the fraudulent scheme and grow it exponentially.  Pershing materially misled the CD investors, led them to falsely believe that they were conservatively invested and concealed the truth from the investors that they were being defrauded.

74.    The SEC filed an action against Allen Stanford and SIBL *et al*. on February 17, 2009, and on that same day the Receiver was appointed.  Plaintiffs did not discover, and could not with the exercise of reasonable diligence have discovered, the true nature of the injury caused by Stanford Financial Group, SIBL, SGC, STC, or Pershing until then.

75.    Additionally, the facts giving rise to the Stanford fraud themselves are complex and were not readily ascertained for more than a year following the shutdown of the Stanford operations.  Little or no details concerning the Stanford fraud were available to investors for a long period of time.  In fact, a federal district court commented on the complexity of the case and, on more than one occasion, ruled that even the Court-appointed receiver could not have known of the facts giving rise to various legal actions at the outset of the Receivership.

76.     Accordingly, doctrines of equitable tolling, fraudulent concealment and constructive fraud toll any applicable statutes of limitation until the Fulcrum Investors, using reasonable diligence, discovered or should have discovered the intentional misconduct perpetrated by Pershing.

77.     Additionally, the Fulcrum Investors were members of a putative class – *Turk et al. v. Pershing LLC,* in the United States District Court, Northern District of Texas, Dallas Division, Case No. 3:09-cv-02199-N. – from 2009 through early 2019.  The claims in this action are the same claims that the putative class was pursuing on behalf of all investors until class certification was denied in 2019. Accordingly, any applicable statutes of limitation were tolled until the District Court ruled on the class certification issue.

78.     Lastly, the claims of the Fulcrum Investors were pursued in FINRA arbitrations in 2020 until this Court enjoined them from pursuing the claims in that forum.  Pursuant to FINRA Rule 12206 (c), limitations is tolled for the time that FINRA retained jurisdiction over the claims ("when a claimant files a statement of claim in arbitration, any time limits for the filing of the claim in court will be tolled while FINRA retains jurisdiction of the claim").  As Pershing detailed in paragraphs 23-25 of its Complaint in this matter, FINRA arbitrations were commenced on February 20, May 6, 7 and 20 of 2020.  Pershing participated in those arbitration proceedings, selecting arbitrators and filing pleadings.   FINRA maintained

jurisdiction of those claims through at least July 9, 2020 when this Court enjoined Fulcrum from pursuing arbitration.  Thus, any applicable time limitations were additionally tolled while the claims were pending in arbitration.

## V.  CAUSES OF ACTION

### COUNT 1:  Participation in Breach of Fiduciary Duty

79.    As a registered investment adviser, SGC owed fiduciary duties to the Fulcrum Investors as a matter of law.  As a fiduciary trust company holding IRA accounts, STC also owed fiduciary duties to the Fulcrum Investors with STC accounts.  SGC and STC breached their respective fiduciary duties to the Fulcrum Investors by advising them to invest their money in SIBL CDs, because such investments were entirely imprudent and unsuitable for any investor.  SGC and STC did not have the basic financial information regarding the SIBL investment necessary to make such investment recommendations to the Fulcrum Investors, but instead made the recommendations to purchase SIBL CDs based on the huge, above-market commissions SGC and STC were paid by SIBL to promote the CDs.  SGC also breached its fiduciary duties to Fulcrum Investors by advising them to invest their money in SIBL CDs even though SGC lacked sufficient information regarding

SIBL and SIBL's purported investment portfolio to properly recommend such investments.

80.    Pershing knew that SGC and STC owed their respective fiduciary duties to Fulcrum Investors, and Pershing knew that SGC and STC were breaching said fiduciary duties, as described herein.  With full knowledge that SGC and STC were breaching their fiduciary duties to the Fulcrum Investors, Pershing conspired with and aided and abetted and otherwise participated in SGC's and STC's breaches of those duties by the conduct alleged herein.  Pershing's participation in breaches of fiduciary duties are a proximate cause of actual damages to Fulcrum Investors. Pershing knew or should have known that its aiding, abetting and participation in the breaches of fiduciary duties set out above likely would result in extraordinary harm to Fulcrum Investors.   Accordingly, Fulcrum Investors are entitled to recover exemplary damages in excess of the minimum jurisdictional limits of this court.

## COUNT 2:  Aiding and Abetting Violations of the Texas Securities Act

### A.  SALES OF UNREGISTERED SECURITIES

81.    Pershing is liable as an "aider" for sales of unregistered securities to Plaintiffs.    In particular, by its actions described herein, Pershing provided substantial assistance to SGC, STC and SIBL and made it possible for SGC, STC

and SIBL to effectuate the sale of the CDs to the Fulcrum Investors and others and materially aided SGC, STC and SIBL to sell unregistered securities to the Fulcrum Investors from, by and through Texas.   As argued by the SEC in its original Complaint, the CDs offered and sold by Stanford Financial Group and SIBL, with Pershing's participation, constitute "securities" under the relevant securities law jurisprudence, primarily the *Reves* test, precisely because the CDs were not insured by the FDIC, or guaranteed by any similar government regulatory insurance regime. By agreeing to assist SGC, STC and SIBL to effectuate the sales of these securities products, Pershing acted recklessly and knew or should have known that said sales were illegal.   But for Pershing's participation, SGC, STC and SIBL could not have sold unregistered securities to Fulcrum Investors and others from, by and through Texas.

82.    Pershing had general awareness that it was assisting in the sale of unregistered securities from, by and through Texas.   Pershing an extensive due diligence on Stanford Financial Group, and knew that SGC was based in Texas and was selling CDs issued by an offshore bank it controlled from Texas, and knew that SIBL did not function as a regular bank making loans but, rather, invested the CD proceeds in a private investment portfolio.   Pershing also knew that the CDs being peddled directly from Houston, Texas had not been registered as securities with the SEC or the Texas State Securities Board, because Pershing knew that SIBL had filed

for a limited Reg. D exemption for certain "accredited" U.S. investors only.   Based on its due diligence, the size of the CD offerings, the way the CDs were marketed to the public, and what SIBL was allegedly doing with the money, Pershing also knew that the Reg. D exemption did not apply and that Stanford Financial Group was operating as an unregistered mutual or hedge fund in violation of the Investment Company Act, selling unregistered investment company securities.

83.    In assisting a Houston-based enterprise in the sale of unregistered securities, Pershing was at the very least subjectively conscious of a risk of illegality. None of the CDs sold to the Fulcrum Investors were ever registered with the Texas State Securities Board and therefore they were sold to the Fulcrum Investors as unregistered securities in violation of the Texas Securities Act.  In assisting SGC and SIBL effectuate the sale of the unregistered securities from, by and through Texas, Pershing acted intentionally or with reckless disregard for the truth and the law.  As a result of Pershing's conduct in materially aiding SGC and SIBL to sell unregistered securities from, by and through Texas, the Fulcrum Investors have lost their investments and are entitled to the statutory remedy of rescission.   In the alternative, Pershing's violations of the Texas Securities Act are a proximate cause of actual damages to the Fulcrum Investors, being the difference between their investments as stated in their last account statement and the amount the Fulcrum Investors may receive from the receivership distribution.

84.     Moreover, and despite SGC's scheme to evade compliance with the Texas Act by claiming a Reg D exemption, the global offering of CDs by Houston-based Stanford Financial Group to "accredited" U.S. investors was in fact an unregistered public offering made in violation of Article 581 of the Texas Act.  It was an integrated offering under Texas securities laws, and, on information and belief, involved each of the following factors that made it a public offering and not a private offering exempt from registration:

a. The integrated offering involved general solicitation. This general solicitation by Stanford Financial Group through SGC, STC, SFIS and its U.S. affiliates, agents and brokers, as well by the foreign financial advisors, included general public advertisements, publicly distributed magazine articles, television and other communications and media published in print in Houston, Texas and distributed broadly for general distribution in the United States and abroad to offerees and purchasers of the CDs.

b. The integrated offering involved general solicitation through television advertisements, including advertisements broadcast in Texas, Louisiana and Florida, of Stanford Financial's products, including the CDs.

c. The integrated offering involved seminars and meetings conducted in the United States (including Texas, Louisiana, and Florida), Mexico and Venezuela and elsewhere in Latin America.  The integrated offering was conducted through the use of sales seminars, "road shows," and meetings

directed at potential offerees and purchasers.

d.  The integrated offering involved offers to tens of thousands of offerees and purchases by thousands of offerees involving sums of money, in the billions of dollars, far in excess of that disclosed to the SEC in SIBL's Form D filing with the SEC. The integrated offering involved offers to, and purchases by, at least thousands of Texas, Louisiana, and Florida residents or those otherwise subject to Texas, Louisiana, or Florida law, as well as offers and sales to Mexican and Venezuelan residents in the Texas and Florida offices of Stanford Financial Group and/or SFIS.

e.  The aggregate size of the sales of CDs during this period was approximately $7.2 billion. The aggregate size of the sales in the United States from this period was in excess of $1.5 billion.  The number of investors purchasing the CDs in the U.S. under the Reg. D filing was far in excess of 1,000, and Pershing knew this because it wire transferred money from 1,200 different SGC accounts to buy the SIBL CDs.

f.  The offering was made to investors with whom Stanford Financial Group/SGC had no pre-existing relationship.

g.  The offering was made to persons who did not qualify as "accredited United States investors"; and far more than 35 persons who did not qualify as "accredited United States investors" purchased the CDs; indeed the vast majority, at least $5 billion of the CDs, were sold to foreign citizens that did not qualify as "accredited United States investors."

## B.  SALES OF SECURITIES BY UNREGISTERED DEALERS

85.    Defendant aided and abetted SIBL and Stanford Financial Group in the sale of securities to Plaintiffs from, by and through the State of Texas without being registered as a dealer, in violation of Sections 12(A), 33(A)(1), and 33(F)(2) of the Texas Securities Act.  Specifically, and as alleged herein, Pershing knew or should have known that the global conglomeration of entities known collectively as "Stanford Financial Group" was acting as a hedge or mutual fund without being registered as such under the Investment Company Act, and that the hedge or mutual fund was disguising itself as a bank (SIBL) and issuing hedge/mutual fund shares, disguised as CDs, to the general public from, by and through Texas and then pooling its customers' money together to make illiquid, speculative investments.  The Stanford Financial Group "fund" made these sales without registering with the Texas State Securities Board as a dealer under Section 12(A).

86.    Pershing intentionally and actively aided and abetted the Stanford Financial Group "fund" to operate in and from Texas to sell securities from, by, and through Texas, by means of the conduct described herein. With full knowledge that Stanford Financial Group was, directly or through its web of affiliated companies, including SIBL, acting as an unregistered investment company "fund" in Texas selling "fund" securities from, by, and through Texas, and that Stanford Financial Group/SIBL were being operated and "run" from Texas, Pershing aided and abetted,

materially and substantially assisted, and perpetuated Stanford Financial Group and SIBL's violations of the Texas Securities Act by continuing to provide the wire transfer and other services described herein to effectuate the sale of the worthless CDs and fund the Ponzi scheme.

87.    Pershing had general awareness that it was assisting the sales by an unregistered "fund" of unregistered "fund" securities from, by and through Texas. In assisting the sale of unregistered "fund" securities through a Houston-based enterprise, Pershing was, at the very least, subjectively conscious of a risk of illegality.  In performing the acts described herein to aid and abet the sale of securities in Texas by an unregistered dealer, Pershing acted with the intent to perpetuate the sale of securities by an unregistered dealer, or acted with reckless disregard for the truth or the law.  As a result of Pershing's conduct in aiding and abetting the sale of securities in Texas by unregistered securities dealers, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission.   In the alternative, Pershing's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIBL as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

## C.   UNTRUTH OR OMISSION

88.    Pershing, acting with intent to deceive or with reckless disregard for the truth or the law, materially and substantially aided Stanford Financial Group and SIBL and their principals in the sale of uncovered securities through the use of untrue representations or materially misleading omissions, and also aided and abetted the fraudulent practices of registered investment advisers in violation of the TSA.  In particular, and as set forth in the Davis Plea, Stanford Financial Group was a massive Ponzi scheme that was perpetuated by the continued sales of the SIBL CDs to unsuspecting investors like Plaintiffs.  Stanford Financial Group led Plaintiffs, verbally and through written marketing materials prepared and disseminated via Stanford Financial Group's Houston office, to believe that their money was being invested in safe, liquid investments that were insured, which was a material misstatement because the money was not invested in safe, liquid and fully insured investments, but rather was pooled together with other investors' money and then mostly used to: (i) purchase long-term, illiquid and high-risk investments, including real estate development projects in Antigua and elsewhere in the Caribbean; (ii) personally enrich Allen Stanford and other Stanford Financial Group employees, including funding their lavish lifestyles; and (iii) maintain Stanford Financial Group's image of wealth, power, and prestige.   Stanford Financial Group's investment adviser and broker/dealer, SGC, also omitted to inform investors like

Plaintiffs that SGC lacked sufficient information regarding SIBL and SIBL's purported investment portfolio for SGC to properly recommend any investments in SIBL CDs.  Moreover, Stanford Financial Group omitted to inform investors like Plaintiffs that it was selling them unregistered securities and that it was operating as an unregistered, uninsured, illegal investment company "fund" in violation of the Investment Company Act and the Texas Securities Act.

89.    Pershing had general awareness that they were involved in improper activity and that they were assisting the sale of unregistered securities from and through Texas.  With knowledge that SGC and STC were misleading investors about the nature and risk of investments in related party bank SIBL, and with reckless disregard for the truth and the law, Defendants provided substantial assistance to Stanford Financial Group in the effectuation of $500 million worth of CD purchase transactions as described herein, and thereby materially aided SGC and STC's sales of securities through the use of untruths and materially misleading omissions. Pershing was all subjectively aware of, and absolutely indifferent to, the risk posed by their conduct.    In assisting the sale of securities through a Houston-based enterprise, Pershing was, at the very least, subjectively conscious of a risk of illegality.  In short, Defendants' actions as described herein allowed SGC and STC (and Stanford Financial Group) to continue to sell securities to Plaintiffs from and through Texas using untruths and materially misleading omissions.

90.     In performing the acts described herein to aid and abet the sale of securities through the use of untruths and materially misleading omissions, Pershing acted with the intent to perpetuate the sale of securities by Stanford Financial Group, or acted with reckless disregard for the truth or the law.  In fact, Pershing acted with wanton and arrogant disregard for the truth and for the protections afforded by the Texas Securities Act by engaging in the conduct described herein.   Pershing's actions in aiding and abetting Stanford Financial Group's fraud.  As a result of Pershing's conduct in aiding and abetting the sale of securities from, by and through Texas using untruths and materially misleading omissions, Plaintiffs have lost their investments and are entitled to the statutory remedy of rescission.   In the alternative, Pershing's violations of the Texas Securities Act are a proximate cause of actual damages to Plaintiffs, being the difference between their investments in SIBL as stated in their last account statement and the amount Plaintiffs may receive from the receivership distribution.

## D.     CO-CONSPIRATOR LIABILITY

91.     Pershing is jointly and severally liable as co-conspirators for Stanford Financial Group and SIBL's primary violations of the Texas Securities Act.  In particular, Pershing knowingly combined together and with others at Stanford Financial Group to assist Stanford Financial Group to sell unregistered securities from, by and through the State of Texas using untrue representations or materially

misleading omissions pertaining to insurance coverage for SIBL. As described herein, Pershing took various overt acts designed to assist Stanford Financial Group to accomplish the goal of selling CDs from, by and through the State of Texas and operate as an unregistered securities dealer selling unregistered securities from Texas. Pershing's conspiracy with Stanford Financial Group to violate the Texas Securities Act is a proximate cause of rescission and/or actual damages to Plaintiffs, being the difference between their investments in SIBL as stated in their last account statement and the amount Plaintiffs may receive from the Receivership distribution.

## VI.   DAMAGES

92.   Pershing is jointly and severally liable for the injury caused by Allen Stanford, Stanford Financial Group and SIBL under Texas common law of joint and several liability as well as under the Texas Securities Act.

93.   As a direct result of Pershing's actions, the Fulcrum Investors were damaged. The Fulcrum Investors lost the value of their investment in the SIBL CD. Fulcrum Credit, standing in the shoes of the Fulcrum Investors, is entitled to a return of the principal invested in the SIBL CDs. Additional damages include compensation for the loss of use of the invested funds.

94.   Pershing should not be allowed to profit from its wrongdoing. Under applicable legal and equitable doctrines, Pershing should be required to disgorge all profits it made from its relationship with the Stanford companies. This amount is

unknown to counter-plaintiff at this time, but it is known to Pershing and will be determined through discovery.

95.    The wrongful conduct set forth herein constitutes fraud or malice, willful acts or omissions, or gross neglect within the meaning of §41.003, Tex. Civ. Prac. & Rem. Code.  Plaintiffs are entitled to recover punitive damages in an amount necessary to punish the Defendant and to deter similar conduct of others in the future.

96.    Pershing should also be required to pay pre- and post-judgment interest; costs of court, and attorneys' fees.


## PRAYER

WHEREFORE, Counter-Plaintiff prays Pershing be summoned to answer this counter-claim and that upon final judgment the Counter-Plaintiff recover their damages as alleged herein, including its actual damages, punitive damages, and costs and expenses of suit, including reasonable attorneys' fees.  Counter-Plaintiff prays for such other relief to which it may be justly entitled.

DATED: July 23, 2020

Respectfully Submitted,

**STANLEY LAW, P.C.**

*/s/ Michael J. Stanley*

Michael J. Stanley
TBN 19046600
mstanley@stanleylaw.com
230 Westcott, Suite 120
Houston, Texas 77007
Telephone: 713-980-4381
Facsimile:  713-980-1179

**ATTORNEY FOR DEFENDANTS
and COUNTER-PLAINTIFF**

## CERTIFICATE OF SERVICE

On July 23, 2020, I electronically submitted the foregoing document with the clerk of court for the U.S. District Court, Western District of Texas, using the electronic case files system of the court.  I hereby certify that I have served all counsel of record electronically or by another manner authorized by Federal Rule of Civil Procedure 5(b)(2).

*/s/ Michael J. Stanley*

Michael J. Stanley